Our next case on the call of the dockets, Agenda No. 5, Case No. 114-496, Performance Marketing Association, Inc., I believe, v. Brian A. Hamer, Appellant. Counsel for the Appellant, please proceed. Thank you, Your Honors. Brian Baer of Assistant Attorney General on behalf of Brian Hamer, Director of the Illinois Department of Revenue. This case concerns the constitutionality of Public Act 96-1544, which amended the Use Tax Act to impose a use tax collection obligation on remote Internet retailers. The statute is not facially unconstitutional. It is facially constitutional and in demonstrating why I first want to outline the Commerce Clause tests that govern imposing sales and use taxes. I'm just, again, looking at the posture of this case and the findings. So there's a finding of unconstitutionality. It's here, right? That's correct. But there's also a finding that as far as the preemption, right, of the Internet Tax Freedom Act? Yes, correct. And, I mean, would we even have to reach the constitutional question? I suppose now we're in a position where there has been a finding of unconstitutionality. It would seem that we usually go to ways to uphold the statute or whatever before getting to the constitutional argument. I was just wondering if you could comment on that. Certainly, Your Honor. I think that the preemption argument is itself a constitutional argument because we're talking about a potential conflict with a federal statute. So that also comes under the federal constitution. So you have a Commerce Clause issue and you have a Federal Supremacy Clause issue. So either way, I think the constitutional arguments have to be reached in this case. So if I could... So if we find under the preemption issue, though, we don't have to get to the constitutionality of the statute? Well... Because isn't, indeed, there a bill in Congress now with respect to this very issue? There is a bill in Congress. The effect of that bill, I'm not sure. It might move part of this case. I can't say for sure if it would move all of this case because of the limits on the type of businesses that the sales limits on the businesses. So that's going to have to be a question, I think, that will wait for another day. But at this point, the way I view this case is you have two constitutional issues. You have a Commerce Clause constitutional issue and you have a Supremacy Clause issue. I'm happy to address the Supremacy Clause issue first, but because the Commerce Clause issue sort of was the bulk of the decision below. No, you can go in any order you wish. Okay, thank you. Okay, thanks. So I'll proceed and just, as I say, I was first going to discuss the Commerce Clause test and then I want to explain how this statute meets the Commerce Clause test. And then I'm going to touch briefly on the New York Court of Appeals case and the Overstock Com decision. And then I also want to discuss a few words on the applicable standard for addressing facial challenges. And then I was going to follow up with the preemption discrimination question at the end. The Commerce Clause test for when a state can impose sales and use taxes on sellers is not that difficult. You just have to have a substantial nexus with the taxing state. The substantial nexus standard requires a physical presence in the taxing state. But the physical presence statute is not a particularly difficult standard to meet. It doesn't require a remote seller, for example, to have physical property in the state. It doesn't require there to even be employees going into the state. The physical presence test can be met among other ways where a remote out-of-state seller has an in-state representative performing significant market-maintaining or market-establishing activities in the taxing state. And one of the ways of establishing market-maintaining or market-establishing taxing activities in the taxing state is when you have in-state representatives soliciting sales on your behalf. This has been a recognized principle of constitutional law for at least half a century. It's not a radical or novel concept. And under Public Act 96-1544, this is the nexus principle that applies. An in-state representative is soliciting sales. It's capturing an in-state representative soliciting sales on behalf of the remote seller. Let me ask you a question here that the discussion of it, as we know, comes down to is the solicitation is advertising. The statute uses the expression referral, that the person refers potential customers. And the amount of sales is customers who have been referred by the retailer. So isn't that the word we should be looking at? What is the meaning of that word referral? I think, yes, I agree, Your Honor. That's one of the core questions in this case because the statute first looks to if you have a contract with a person in the state. I think that meets the in-state representative standard. I don't think that's really in dispute. So the question is what does the legislature intend by basing the tax collection obligation on a referral-based commission contract? And I think it's clear that this anticipates something more than advertising. The legislature wasn't intending to tax somebody who just hangs an electric billboard on a website. The referral-based compensation anticipates the in-state resident who will actively attempt to maximize their income by soliciting sales for the remote retailer from their customer. And this is done through this interactive web link. This is more than just, again, electronic billboards. You have to activate the web link. Could you just slow down? Sure. We're kind of good at tech but maybe not so good. Could you help us understand more specifically? Okay. What is happening here? What's happening here? We're trying to figure out the language is referral. Is this a referral or not? What is happening here in terms of the relationship between the person who has the website and the retailer and the customer? What's happening here? I think the fat wallet facts really illustrate that. You have an in-state company. It acts as almost a broker. It has a website. On this website, it makes offers to customers. It says, you buy from Amazon, you buy through Oversight. We will have a coupon. We'll give you a coupon. We'll give you a discount. We'll even give you cash back. Effectively, what they're saying Where do those coupons come from? They come from the in-state retailer. I mean, I think the cash back. I'm sorry. I misspoke. Not the in-state retailer. The in-state representative. So fat wallet, we'll say, or coupons.com or whoever it is. They generate the coupons? They generate the coupons. This is not a relationship that they have with Amazon or whoever else? I mean, there could be contracts where they have a relationship with Amazon, but the contracts that Fat Wallet established is Fat Wallet's offering the discounts. Fat Wallet is telling people, you sign up for a Fat Wallet account. We receive a commission for every sale we make to Amazon. We will share our commission with you. We will share our commission with you. I mean, if that's not solicitation, I don't know what is solicitation. Is the Fat Wallet fax about Fat Wallet, is that in the stipulated fax that's before us? I think what's in the stipulated fax is a reference to the newspaper article, that Fat Wallet. Again, I'm not saying the stipulated fax. What facts do we have as to what these companies do? How do we know what they do? Some of them, as you're suggesting, some of the business model is a very direct sharing in profits with the retailer. It could be one thing. But certainly there could maybe be, and your opponent suggests they do something else. How do we know what the universe of websites are? I think that illustrates the problem with bringing a facial challenge to this action. There are a number, there could be any plethora, myriad of ways in which businesses can organize. There's a myriad of ways in which contracts could be entered into between an out-of-state retailer and an in-state representative, an in-state website. Excuse me, what kind of, so the internet affiliate, do they have a relationship with, say, Macy's or some other store someplace else? They could. That's very possible. So if I want to go online and I go to Fat Wallet and I want to buy something from a particular store and they give me a coupon, do they purchase it for me or do I go directly? No, you are linking directly to the retailer, the out-of-state retailer. So in a case like Macy's, who has a presence in Illinois, they're going to collect the use tax on you. Something that doesn't have a presence. Something that doesn't have a presence. Right now, as things stand, before this statute was enacted, they would not collect the use tax on you. But the affiliate, the internet affiliate, doesn't have the relationship with that retailer necessarily. I buy it myself. They have the relationship with the retailer to make the referrals. They want these companies to refer them contracts, to refer them sales. The sale itself gets made through the – these are not retailers. And, again, I think I misspoke of that in my opening brief. The in-state people are not retailers themselves. They're like brokers or sales agents or sales representatives. They're not the ones – it's kind of like in the Scripto case. But their name is internet affiliate? These are called – and that's another – they're called – often the contracts they enter into are called affiliate agreements. Now, that's a little confusing, I know, because they are not corporate affiliates of the out-of-state sellers. So this is a type of nexus which is known as attributional nexus. There's another form of nexus known as affiliate nexus, which refers to the nexus between, say, Barnes and Noble.com and Barnes and Noble. But this is not that. This is attributing the nexus to an out-of-state remote retailer through the actions of an in-state representative who they have a contractual relationship with. And that's, I think, what I think we're all struggling with. Sure. Okay. We don't understand what it is that they do. We don't understand what they do enough to be able to determine whether there's a nexus. And what they do is, I think you can – well, one of the stipulated facts, and I can't put my finger on the stipulation, referenced this newspaper article in Wisconsin, which explained some of what is done. And it says here, it says, Fat Wallet does not sell products. Fat Wallet does is bring people to its site for coupons, ads, and bargains that lead consumers to sites such as Amazon.com, Overstock.com, or Barnes and Noble.com. It makes money from commission on those sales and from advertising. So this is part of the stipulated facts. In addition, we did include in the motion for summary judgment a copy of the contract with Fat Wallet that Fat Wallet has with its – the people who join up with Fat Wallet, it explains. Now, at this point, the circuit – Who joins up with Fat Wallet? Any individual can. You can open an account on Fat Wallet, and you'll then have the opportunity to get all the discounts Fat Wallet provides. You have the opportunity to create a cashback program where when you buy from customers, they will deposit part of the commission that they earn from each sale into your account. And that's cash that you can then use to make other sales. So this is what this statute is getting at. It's getting at – Would a finding of constitutionality with respect to this statute obviate the necessity for – we're not that far removed from tax day – for the use tax line on the Illinois Income Tax Form? It – not necessarily. Because it would – I'm trying to go along with what Macy's, for example, poor example because they have a presence here, right, so they're going to tax whether you buy online or whether you buy in Macy's store. Right. There are other retailers in various states that don't have a presence here that may or may not tax. If they don't tax, that's what the use tax line on the – and this statute would only encompass those that are not retailers, that incorporate a number of retailers? Well, a couple of – Or wholesalers. I guess my answer to that is going to be yes and no. If you – you can always self-report all your use tax. You can keep your receipts. I mean, if you buy from an out-of-state retailer that has no presence in Illinois, you can keep your receipts. You can self-report on your Illinois income tax, and you don't have to fill out that line. That line is there just – it's sort of an assumption for people because most people don't self-report. So that kind of tries to capture that. Now, if you're self-reporting all of your out-of-state purchases for use tax that you didn't pay use tax on then, you don't need to use that line. This will make it, I suppose, less necessary because for some people who use these particular entities – They would be taxed. Because they will – the use tax collection will be collected from them. So – but it doesn't mean that there might be other use tax that they – You can see some of the – now, I am going to get into just a little bit of the preemption argument. Sure. You know, under the ITFA, there's a moratorium against such taxes. Would you agree with that? There's a moratorium on discriminatory taxes, among other things. Yeah, and my understanding is that Congress wanted to put a moratorium on all such taxes. Well, it sorted out the thorny questions we're discussing here of how to tax electronic commerce. Would you think that's the purpose of the act? Would you agree on that? I guess I would disagree. It didn't want to put – If it wanted to put a moratorium on all of the taxes, it could have very simply said so. But it listed a number of criteria of type of taxes. And the issue in this particular case is does this tax discriminate against electronic commerce? And it does not for a couple of reasons. First, the Use Tax Act already taxes to the constitutional limit. So this falls squarely within a tradition of representational nexus. It falls squarely within scripto, Tyler Pipe cases like that. And so it's very possible that the Use Tax Act could already encompass this sort of organization. Scripto, you mentioned – let me ask it this way. Hess-Quill test for establishing the physical presence. Is that actually different from what's applied in scripto and Tyler? Yes. This case doesn't – has nothing to do with Quill or Bellis-Hess. We're not attacking Quill or Bellis-Hess. We're not trying to undermine those decisions. In Quill and Bellis-Hess, there was no in-state representative. It just did not involve that particular fact pattern. It was an out-of-state party. The court said if all you're communicating through is U.S. mail and common carrier, that's not enough. There were no in-state sales nets, in-state sales representatives. There were no corporate affiliates in the state. So that's a whole different line of cases that will exist and continue to exist, whatever this Court's ruling on it, on this case. So does your argument assume that the placement of the interactive link on the website constitutes solicitation, even if no further activity is undertaken by the Illinois website? That, again, would be an open question, Your Honor. What the – I mean, the way this statute is worded, which requires referral contracts, anticipates that the in-state person is going to be engaging in solicitation. If you just had a web link with no contract on it, it probably wouldn't fall within the terms of the statute, for one thing. So we wouldn't be here necessarily on a constitutional question. Whether that would meet the Quill standard or not meet the Quill standard, I think, is an open question. Because you still have – unlike Quill, you still have the in-state representative. The question of whether they're doing enough to get past Quill, I think, is a decision for another case. It isn't just a question represented by this Court under the wording of this particular statute, though. So – Counsel, is it a question of what is the substantial nexus? It's a question – the question is this. With Illinois. Yes. I mean, the question is, does this statute on its face create – capture activity that would establish a substantial nexus with Illinois? Now, is it possible – can we hypothesize a contract that doesn't? Sure. But the fact – but with this – the legislature here is making a good-faith effort to sweep up language that it – that would capture the kind of solicitation that has been established as establishing nexus in this case. And – Well, here's my follow-up. What is the factual activity that creates that substantial nexus to Illinois by the retailer? It's the contract with the interstate or the in-state web representative who refers sales through the web link with the out-of-state retailer. So is it the contract itself, or is it the conduct of the referring? It's the conduct of the referring, and it's through the web link. The web link – web link is an interactive action. Right. Okay. And under this statute, you have the conduct of referring sales through that for – on a commission. It's the referring on a commission basis, which is going to – Well, I got that part of it. Yeah. I guess I'm just trying to understand physically what the factual conduct is. If you're a laid-off factory worker from Galesburg that used to work making dishwashers or – Sure. – washing machines. I mean, if they sit in Galesburg and run some activity to try and create some business. Sure. It's the web link through the referral contract, the receipt of commissions, and it's the connection through the web link between the out-of-state retailer and the in-state representative. Let me – I see I only have a few minutes left, so let me address again a couple of points about the preemption argument. The – on the preemption argument, the plaintiff is making a couple of – I think a couple of arguments. One, they're claiming this doesn't discriminate because it imposes a tax collection obligation on Internet advertising that doesn't impose on other forms of media. That's not correct. I think the Illinois statutes already impose – use tax collection on other form of media. The particular statute, 96-1544 itself, named a number of different media-type connections that could – on which it could impose state taxation. They're also arguing, I think – they're also, I think, trying to make an argument that because this particular arrangement is so unique that it's – there is no comparator and, therefore, it must discriminate. But I think – I mean, I think that's an over-reading of the statute. The statute isn't supposed to create an exemption for Internet taxation. It's supposed to prohibit non-discriminatory taxation. And again – Mr. Peroff? Yes. Sorry, but your time has expired. Oh, I'm sorry. Thank you, Your Honor. Thank you. Counsel for the appellee. If it pleases the Court, my name is George Isaacson. I'm counsel for the Performance Marketing Association. I appreciate the opportunity to appear before the Court today, ProHoc V.K. I'd like to address some of the questions that were raised by the justices during my brother's initial operation. And Justice Thomas asked the question whether if we address the preemption issue, is it then not necessary even to reach the question of the Commerce Clause question relating to the substance of the statute itself? I believe the answer to that question is yes, that Congress has established a moratorium where it has limited state action in regard to certain transactions conducted over the Internet. As Justice Thomas pointed out, that Congress is currently considering legislation that would address this issue. It's legislation that was sponsored by Senator Durbin from Illinois, the Marketplace Fairness Act, which has passed the Senate and is now before the House of Representatives. And that bill is a bill that is intended to balance the burdens on interstate commerce by requiring certain simplifications in regard to the administration of state sales and use taxes with the opportunities of states to expand the scope of their jurisdiction to require collection by remote sellers. And we would suggest that that is a much more intelligent way to address this issue than it is by disparate state legislation in which individual states attempt to expand the scope of their reach through legislation that is not consistent, that does not provide for any simplification measures. So this Court does have the option before it to address the Supremacy Clause preemption issue and not reach the Substantive Commerce Clause issue. I also would like to address... Counsel, so it wasn't necessary for the Circuit Court to find the statute unconstitutional when it found that it was preempted? It would have had that option. I think, as my brother correctly indicated, both are constitutional questions. One is a Supremacy Clause question, one is a Commerce Clause question. So I don't think the Court was incorrect once it decided it had to reach the constitutional issue to address both constitutional issues. So it wouldn't have had to? It would not have had to, correct. As the Court did not reach Count 2, which was another Commerce Clause issue having to do with reach beyond its territorial jurisdiction, so I don't need to reach that having addressed Counts 1 and Count 3. I would also like to address Justice Tice's question regarding this use of the term referral, which is the operative term that's used in this statute. Under the statute, there are only four criteria that are necessary in order to subject an out-of-state retailer to tax collection responsibilities. It has to enter into a contract with an Illinois person. That contract has to provide for referrals through a web link. It needs to provide for commission payments on any resulting sales, and they need to be $10,000 minimum of sales that result from that. So the operative question is, is this referral relationship, whether you view that as being passive or affirmative, sufficient? The United States Supreme Court, in the Bellis-Hess decision, said that the furthest reach that a state is permitted to attach a substantial nexus under its decided cases was the Scripto decision. And the Scripto decision was a circumstance in which an out-of-state retailer had 10 manufacturers' representatives who consistently called on accounts that took orders from customers that referred those orders to the out-of-state retailer who then fulfilled the orders, and those manufacturer representatives would periodically follow up to determine whether the customer is satisfied or not. The United States Supreme Court said that's the furthest reach of an out-of-state retailer being subject to having an in-state presence through this attributional nexus theory, this representative theory. So I think the appropriate question is, does a referral relationship rise to that level? I think that's the substantive question. No court, state or federal court in the United States, has found that that kind of limited activity is sufficient to create nexus. This would be the first court to find that such activity is sufficient. And my brother in his opening statement made brief reference to the New York overstock Amazon decision in which the court said that the most that that referral relationship does is creates a presumption, and that's what the statute in New York provides. It simply provides that if you have this relationship, these referral relationships, that that creates a rebuttable presumption. And the New York Department of Taxation and Finance explained that it's relatively easy to overcome that presumption. You have to have a provision in your contract with the in-state web affiliate stating that they may not engage in any solicitation activity, and you need to get an annual certification from them that they are not engaged in any solicitation activity. And once that is done, you have rebutted the presumption. For the department to argue that there's no difference between the New York case, which simply creates a rule of evidence, switching the burden of going forward, not even the burden of proof, as being exactly the same analysis as is present when you have a conclusive rule created by the General Assembly in Illinois, I think is simply illogical. There is no opportunity to rebut the solicitation issue that is present in New York. And it's the reason why I think that the only real issue that is before this Court in regard to the Commerce Clause question is to be looking at the four criteria. As I explained to them, it's having a contract, it's having a referral, it's having a commission, and it's having $10,000 of sales. The fact that there may be some companies, these web affiliates or web publishers, who do additional activities that are beyond the scope of the statute, beyond the criteria, is really irrelevant to this Court's consideration. For example, you could have a web affiliate who also runs a consignment store on behalf of the out-of-state retailer. There's no question that the operation of a consignment store, in which a remote seller owns inventory, in which sales are being made on behalf of the remote seller, would be sufficient to create nexus. And it may also be that there was a web link that that individual had. This statute is not concerned with that Commerce Clause issue. This statute is not concerned with these questions of what is the coupon relationship, that fat wallet, which, by the way, is not even an Illinois company. It relocated outside of the state. This statute isn't concerned with this. This statute is concerned with these narrow activities and the question of whether those activities, not whether additional supplemental activities, are sufficient to constitute a constitutional nexus. And then is the question before us a statutory interpretation of what the legislation meant by referral? Is that specifically the question, the narrow issue before us? I don't think there's any question what's meant by referral. And I think it's something which all of us have done. You go onto a website, and when you go onto a website, the website does not disclose its location. You don't know whether that's an Illinois website or a Florida website. You don't know where the servers are located. The Internet is disrespectful of these kinds of borders. But all of us have had the experience. You go on a website, and you see an advertisement, and you click on that advertisement, and it takes you to another website where you then can make a purchase. I don't think Mr. Barov and I have any disagreement as to what constitutes a referral. That is the referral activity. So it's an advertisement. There's a picture. It's really nice-looking shoes. I click on that. It takes me to the samples. Exactly. Is that what this is? That's exactly what it is. Is that what's happening here? Yes. I thought we were talking about coupons and promotional codes and sharing and commissions and rewards benefits for the consumer. We are not. We are not. You meet the requirements of the statute if you have this click, hot link relationship that Your Honor just described. What Mr. Barov is saying is that some of those companies engage in additional activities beyond the statutory criteria. They may be offering their own coupons and sharing discounts. They may have relationships with out-of-state retailers that involve other kinds of pre-sale and post-sale activities. Some of those activities beyond the statutory criteria may constitute nexus. But that's not what this statute is referring to. Can we talk a moment about how we analyze a facial challenge? Certainly, I think this is what you're getting at. The state is arguing that the legislature has used this word referral. It can mean a great deal of things. And as you just indicated, some of that referral business might, in fact, be sufficient enough to create a nexus. I want to be clear, Your Honor. The referral is limited to the click and the link. That's what the referral is. The additional activity that Mr. Barov is referring to is saying that there are some of these companies who, in addition to referral, engage in other kinds of activities.  Consequently, in looking at the facial challenge issue before you, I suggest that all that you need to do is look at those four criteria and determine whether those four criteria, when held up against the Commerce Clause standard, established in the strong line of cases of Bellis-Hess and Quill, which my brother acknowledges he does not dispute their continued applicability, whether it meets that standard or not. That's the issue. In the briefs, there's a discussion of the Solano case and the Washington Grange case. And those cases are very different than we have here. For example, the Solano case concerned the 1984 Federal Bail Reform Act, in which it's possible if there's a finding of dangerousness to public safety where bail does not need to be provided. And it was challenged on due process and Eighth Amendment grounds. And the issue that was present there was the question of whether that's a clear violation of the Constitution or whether there are circumstances in which a magistrate may find that there is such a danger to public safety that extending bail to the defendant would endanger public safety and therefore doesn't violate the Eighth Amendment. The standard in the Solano case was clear. And the court was simply saying there may be facts in which it would be properly imposed. In this case, the standard is clear, these four criteria that I mentioned to you. And the only question is when you hold those criteria up against the Bellis Hess Quill physical presence substantial nexus standard, do they meet it or do they not meet it? If they do meet it, if that does constitute a physical presence, which I believe is the question Justice Freeman was asking, is that activity alone, this referral activity alone, with no further solicitation activity, because no further solicitation is required by the statute, I believe the justice's question was does that satisfy the Bellis Hess Quill standard? We submit to you that it does not satisfy that standard. And that's the judgment this court needs to make. It does not need to look at these additional supplemental activities that go beyond the criteria. I would like to make sure that I have an opportunity to address the Infinite Tax Freedom Act issue further, because I think it is critical to the question of whether this court would prefer to address this matter on those grounds. What Congress clearly intended to do during this moratorium, and it is a moratorium, it's not an absolute prohibition, it expires in 2014, was to state that you can't treat transactions over the Internet in a manner that is different in any manner from similar transactions that are not conducted via the Internet. The stipulations in this case provide that there are performance marketing arrangements that are conducted through magazines, through newspapers, through radio advertising, where there is a similar tracing of a transaction through the use of codes that may be present in a newspaper ad or in a radio television commercial saying just tell them that Arnie sent you when you placed the order so you can track the origin, and where a similar commission is paid as a result of those non-Internet referrals. This is in the stipulation. It's clear. In these latter performance marketing arrangements, newspapers, magazines, radio, television, that does not fall within the scope of the act under your consideration. It does not result in the remote seller being subject to a tax collection obligation. It is only if that transaction is effected over the Internet, if the referral that we are discussing is a referral via the Internet and not a referral through these other media, that it results in this tax collection obligation based upon the notion that that company now falls within the definition of maintaining a place of business in Illinois. The state, of course, disagrees with your fundamental premise here that this is all advertising, whether it's an ad in the newspaper or it's an ad on the Internet, that you seem to say it's all the same. They say, no, no, no, what we're talking about here is fundamentally different. Whatever this referral click-through business is about is fundamentally different from a newspaper ad. And then they say, can you give us any other example that we could measure against that functions in this way?  They are saying that it's fundamentally different than performance marketing that's conducted by publications or broadcast media. Advertising. They're saying it's different from advertising. Right. But for purposes of the Internet Tax Freedom Act, it's not an advertising versus a advertising plus more equal solicitation. That's a Commerce Clause issue. What we're talking about is the ITFA issue. And I do not believe that they are disputing the fact that there is – it's in the stipulations. I don't have to assume what they're believing. It's in the stipulations that they acknowledge that performance marketing has been around for a long time and it's conducted in newspapers, magazines, radio, and television. And it's done so, as all of us have experienced, where there's a code number. When you place your order and you want to get the discount, you indicate that here's my code number that I got from the newspaper ad or I got from the radio. So that you have two kinds – two media in which performance marketing is conducted. New media, the Internet, which this statute addresses, and old media, which this statute does not address, and Congress made clear in the Internet Tax Freedom Act that you can't discriminate between this new media and this old media at least until 2014 when the court has an opportunity – I'm sorry, when Congress has an opportunity to decide whether they want to further legislate in this field or not. And that's where the rub is because Mr. Baroff said that in this case, there is not discrimination against electronic commerce. Well, he said it, but I don't know what facts he bases it on. Well, I know you don't agree with it. That's why I'm asking. It's more than I don't agree with it. I don't understand it. If you have a radio code that is a form of performance marketing and it's been stipulated that it's a form of performance marketing and it does not create nexus for an out-of-state retailer, but you have the exact same notion of performance marketing by tracking a sale and paying a commission over the Internet, and to say that's not a form of discrimination, I think defies both the stipulations and the logic that underlies the Internet Tax Freedom Act. If that isn't what the ITFA is about, then I don't understand what it is about. And Congress said, States, you cannot engage in that discrimination for the time being. You may be free to do so later, but not at this juncture. There's one other point that I want to just make clear to the Court, that the Performance Marketing Association is the association that represents these Illinois web affiliates. We're not an organization representing the retailers. We don't really have a dog in the fight as to whether retailers should or should not collect tax. If there's federal legislation that would require such tax collection, that's perfectly fine with the Performance Marketing Association. In fact, it would prefer to see a national, uniform, simplified basis for such tax collection. Instead, the web affiliates are the innocent victims of this law, because what has happened on this law is literally thousands of Illinois small organizations that maintain websites, that have these kinds of referrals, have been terminated by the out-of-state retailers, so that the out-of-state retailers are not caught within this catch that has been created. And it's no difficulty for them to say, instead of having these web referral relationships with an Illinois website owner, we'll have these web affiliation relationships with an Indiana website owner or a Florida website owner. Because when the consumer makes the visit to the website, they have no idea where that website is located. There's total anonymity in terms of territoriality in regard to that transaction. So there's no indication that this legislation has been successful in raising additional revenue, but it is stipulated in the record that it has resulted in the termination of Illinois web affiliates. What we suggest is that the unconstitutionality of the legislation, as decided by Judge Shapiro in the circuit court, was the right conclusion. And this is an area that is better left to Congress to resolve than it is to state governments. Again, thank you for the opportunity to appear before you. Thank you. Rebuttal. Thank you, Your Honors. Mr. Barrow, help Mr. Isaacson, and probably more importantly me, understand how it's non-discriminatory in this case. Your Honor, I'm looking through the stipulation. I see where we stipulated that there's such a thing as performance marketing using promotional codes in print and radio. I don't see, can't find it in the stipulation where we admit it's stipulated that that was not, would not create an excess, would not create a taxable event. Let me just kind of give you, you know, there's other parts of this act, and I can read you some of the other areas where a tax collection obligation is imposed. Soliciting orders for tangible personal property by means of telecommunication or television shopping system, which uses toll-free numbers, which is intended by the retailer to be broadcast by cable television or other means of broadcasting to consumers located in the state. Soliciting orders for tangible personal property by means of advertising, which is disseminated primarily to consumers located in the state. Soliciting orders for tangible personal property by mail if the solicitations are substantial. Pursuant to a contract with a cable television operator located in the state, soliciting orders for tangible personal property by means of advertising, which is transmitted or distributed over cable television. So there's a host of means, traditional electronic, non-electronic, in which a form of solicitation or an out-of-state retailer, an out-of-state seller can establish nexus in the state. This is one particular means of electronic commerce. It doesn't discriminate against other forms of electronic commerce. It doesn't discriminate against other forms of commerce. It's based on, and again, it's not, you have to also keep in mind, it's not based on the referral. It's also based on the commission itself. It's the fact that the website operator is going to act on a commission basis, which anticipates the fact that they're going to be doing more than simply advertising. They're going to be actively trying to solicit sales in the state. The overstock decision. The distinction between the presumption that the New York statute established and our rule of law is kind of a red herring. We all have to tax it within our constitutional limits. Plaintiffs contend they have no means of contesting this. Well, they have many means of contesting this under Illinois law. That's sort of a due process argument they're raising, which simply doesn't exist in this case. Again, they want to kind of admit the importance of the commission-based referral in this case. That's just like the referral itself. It's done on a commission. We're anticipating it. This is, again, a facial challenge. Counsel wants to suggest that, well, there might be some people that this would apply unconstitutionally to. That turns the facial analysis on its head. Not only can we hypothesize that there are websites, and in terms of distinguishing this case from scripto, we know there's hundreds, if not thousands, of website affiliates that effectively create a sales force for these out-of-state retailers in this case. I think maybe I can close best with a sort of paraphrase. I'm going to paraphrase the Scholastic Book Club case, which was the Supreme Court of Connecticut involving a case of an in-state representative, and it said they're bringing plaintiff's products to the attention of students or buyers and are presenting them with a means to order, pay for, and receive delivery of those products. That's all this statute is accompanying. That's all that these in-state website operators are doing. They're providing a means for which people can purchase from these out-of-state retailers, and they're effectively creating an in-state sales force for these out-of-state retailers, and that's enough to create nexus under the Commerce Clause. If the Court has no other questions, we would ask that the circuit court's decision be reversed. Thank you. Case number 114496, Performance Marketing Association, Inc., FLE v. Brian A. Hamer. The felon is taken under advisement as agenda number five. Mr. Baroff, Mr. Agziskin, we thank you for your arguments today, and Mr. Marshall, the Illinois Supreme Court stands adjourned.